The Flintcoat Company versus Aviva, PLC. Good morning. Mr. Alvarez? Yes, Your Honor. Fred Alvarez for Aviva, PLC, formerly known as Commercial Union Insurance Company. And with the Court's permission, I'd like to reserve three minutes for a bow. Granted. Your Honors, there are two issues on appeal. The first issue is whether CU can be compelled to arbitrate in an arbitration where it did not sign an arbitration agreement but signed a separate agreement with Flintcoat that said in the event that there's a dispute over that agreement that the parties would ultimately resolve that dispute through litigation and not arbitration. The second issue is whether, if arbitration is not required, whether the case should proceed in a district court in Delaware or in a district court in California where CU sought to file a complaint. With respect to the arbitration issue, just by way of background, the agreement at issue arises out of litigation filed by Flintcoat in California in the early 80s where it sought insurance coverage for its asbestos claims. We've read the briefs and we're all well attuned to the factual background here as well as the procedural background. Could I ask you, though, a legal question that really overarches this entire controversy and it relates to the DuPont precedent of this court. DuPont concluded, and this is a quote, there is no evidence that DuPont embraced the agreement itself during the lifetime of the agreement or that it received any direct benefit under the agreement. I could turn that into a test, I suppose, if you will, of whether there is no evidence that a party embraced the agreement itself during the lifetime of the agreement or that it received any direct benefit under an agreement. Is that a conjunctive test or is it a disjunctive test? That is, is it enough simply to embrace or to receive some direct benefit or are both necessary? I think both are necessary and in DuPont the court looked at whether the agreement that had the arbitration provision had been embraced and whether having embraced it DuPont received a benefit. You might remember, Your Honor, that in DuPont, DuPont when it first filed its complaint had a count as a third party beneficiary. It embraced the agreement by having that count. But doesn't your July 16, 2012 letter embrace the Wellington Agreement by all the block quotes? Well, that's an interesting point and the point I would make there is to the extent that DuPont embraced the agreement by filing a complaint that had a third party beneficiary count, that's more embracement, if that's a proper word. A closer hug. Closer hug than our July letter of 2012 that said that if we go to arbitration we have a potential cause of action for reimbursement. I'll add that under the CU Agreement, CU has that reimbursement claim as well. So it is a future claim that, as our brief makes pretty clear, I hope, in response to that claim Flintcote did not pay. So to answer Judge Myth's question, to the extent that letter embraced, there was no direct benefit. And I think both are necessary under the DuPont case and a number of other cases that have used equitable estoppel. For example, the Kaiser Group case that Flintcote cited in their letter. In that case, the debtor in bankruptcy sought to get a benefit from the agreement that its subsidiary had with another party that had an arbitration clause. And in that case, the debtor said it needed to recover under that agreement in order to help fund its bankruptcy. So your position is that the direct benefit here came to your client through the separate CU Agreement, the agreement from 1989, correct? Correct. And going back to DuPont, in DuPont, ultimately when the court analyzed DuPont's cause of action, the court said that DuPont, even though it was, even though the agreement with the arbitration clause was at the heart of the case at the district court level and at the state level, what saved the day, and that's a direct quote from this court in DuPont, what saved the day for DuPont was that it had a separate oral agreement with a defendant and it could proceed on that separate oral agreement. Here, CU has a separate oral agreement with Flintcote. I'm sorry, written agreement, yes, Your Honor. So our position is that DuPont, while the court said it was a close call, this case is not as close by any stretch of the imagination as DuPont. In DuPont, DuPont actually filed a complaint where it had a third-party beneficiary count, later withdrew it. That's embracing the agreement more, we would submit. And DuPont sought to recover indirectly under that agreement, and the court said, no, you're seeking to recover indirectly. If I recall correctly, the oral agreement that DuPont alleged said that they, the oral And I think in the Boreas case, this court even cited to a Seventh Circuit case, where the Seventh Circuit, and I'll get the citation if Your Honor would like it. We have it, and Boreas was one reason I asked about whether this was conjunctive or disjunctive, because the opinion actually cited DuPont and then referred to the Seventh Circuit case. Industrial electronics. Industrial electronics, and in the first instance used conjunctive to say what we laid down in DuPont, and then used disjunctive when saying that industrial electronics was not exploiting or directly benefiting. So I was left somewhat confused. I think you need both. I think the courts, when they've looked at these situations, have looked at whether the party against whom arbitration is being sought has somehow benefited directly from that. Something that the district court did not speak to in its opinion here in determining that equitable estoppel was applicable, was identifying what the burden of proof was to show the elements of equitable estoppel. And Your Honor, it's interesting. Does Delaware law apply? Well, our position is California law, and I think, and there's a reason for that as we say in our briefs. Well, is there any variation between the requirements of equitable estoppel in Delaware and the requirements of equitable estoppel in California? It's a long, long-aged doctrine with deep historic roots. I'll answer that in two parts. The cases that I've used, the knowing and exploitation, the DuPont analysis, haven't discussed what the standard is. One of the cases that Judge Stark relied on below was the American credit case, which is not... But Judge Stark said nothing about burden of proof. And if you read that case, the burden of proof there is clear and convincing. And if you look outside of Delaware, and we say Delaware law... If it is clear and convincing, if the standard is clear and convincing, there's nothing in Judge Stark's opinion that would suggest he applied that, is there? There is nothing in his opinion that suggests he applied a clear and convincing standard, and I would submit that, given that standard, his ruling was an error. I would also say that, for purposes of review, it's plenary review, so this court would look at all the facts de novo. And Judge Stark and Flinko basically relied on four things to compel arbitration. The August letter that basically said, if we ever go to arbitration, we'll have to get the state lifted in the bankruptcy court. The state was never lifted. And your client wasn't even identified as being among the group who signed that letter, were they? It was one of eight or nine... You're talking about the August letter? The August letter. But the point of the August letter is that, if we ever have to go to arbitration or, quite frankly, litigation, because of the ACNS decision out of the Third Circuit... I know the purpose of the letter. I just want to make sure, because the way that it defines on whose behalf the letter was sent... I think it's... I did not see your client's prior title, commercial... It's one of the prior... So that's your representation, that the August letter was sent on behalf of what we know now as Aviva? Yes. Yes. Okay. Our point is, it wasn't exploiting the agreement, and it wasn't a direct benefit. The letter was written. The state wasn't lifted until CU filed a motion to lift the stay in December of 2012 to allow them to go forward with litigation. The other point that they rely on is that CU, along with other insurers that were participants in the Wellington Agreement, engaged in mediation. Our point is, engaging in mediation is not exploiting the agreement. The parties are trying to resolve their dispute, granted. We did... We negotiated for six years, and some of my clients settled with Flintcoat. Others, like CU, didn't. But engaging in settlement negotiations is not exploiting the Wellington Agreement. And then, there were discussions about entering into a written arbitration agreement. And we exchanged drafts. And those drafts, the drafts that issued, they weren't signed. So our point is, exchanging drafts of arbitration agreement doesn't compel a party to proceed with the arbitration. In both your opening brief and your reply brief, you make a comment that says that Flintcoat could have sought arbitration during the course of the process. How does that square with your position that they couldn't have sought it against your client when your client wasn't party to an arbitration clause? I think the point we made in both briefs is that if... And I think it was in response to an argument that Flintcoat had made that somehow, particularly in their brief, that somehow we strung them along. And the point that was being made is that under the Wellington Agreement, if Flintcoat wanted to proceed to arbitration, they could do that at any time. And Flintcoat admits that at page 28, I believe, of their brief. And outside the Wellington Agreement, any party could see some mediation and proceed to either arbitration or litigation if they were at an impasse. And the point I was trying to make, Your Honor, in both those submissions, were that Flintcoat says that they were hurt by the delay. And the point simply is if speed was such an important issue for Flintcoat, they could have easily proceeded to either litigation or arbitration at any time. The other issue, and I see I only have a few seconds left, the other issue is that if this Court does reverse Judge Stark on the arbitration issue, CU sought to let this stay at the file in California. And our position is that the first file rule does not apply because they used the bankruptcy stay to be able to file in Delaware before we were able to file in California. Thank you, Your Honor. Thank you very much, Mr. Alvarez. We'll have you back on rebuttal. Mr. Ciafullo? Yes. Did I get that right? That was excellent. Much better than most. Thank you. All of my language is self-taught. Italiano? No, it's correct. Good morning, Your Honors. Thank you very much. As you said, my name is Louis Ciafullo, representing the Flintcoat Company. And going back to one of the questions that Your Honor asked Mr. Alvarez, yes, they did embrace the Wellington Agreement. Aviva UK and its predecessor iterations embraced it by entering into the Wellington ADR proceeding. And from that very first moment, when it entered into the agreement to proceed with mediation in what is a very seamless ADR provision in the Wellington Agreement that provides for negotiation, once there's an impasse that's either declared by the mediator or agreed to by the parties or based upon one party's belief that there is an impasse, that it then proceeds to arbitration. So is that language from DuPont that I cited to Mr. Alvarez language that is conjunctive or disjunctive? I believe it's disjunctive. But I think even if the Court finds that it is conjunctive, that both elements are met here. So what benefit? We've heard your position already on embracing the agreement. What direct benefit was realized by Aviva or CU? The benefit that was realized under the Wellington Agreement was that it's twofold. One part of it is that they used the Wellington Agreement and Flinko used the Wellington Agreement as the foundation for what we call the Shadow Wellington Agreement that was entered into by the parties. And when reimbursement was... Flinko doesn't find a provenance anywhere else in the record here. I do not believe that there is a case that uses that term. That is what Flinko refers to it as. I don't think the contract even calls itself the Shadow Wellington Agreement. That's why we call it the 1989 Agreement. The shadow knows. Yes, yes, yes. But the basis for the 1989 Agreement was the Wellington Agreement. And in the 2012 letter, as Your Honor pointed out, Aviva did rely on the Wellington Agreement provisions on reimbursement because the 1989... But I'm not seeing a benefit here. Where's the benefit that they received from the Wellington Agreement? Well, the benefit that they would have received from the Wellington Agreement if Flinko had agreed to the reimbursement was that they would be reimbursed pursuant to the terms of, I believe it's Article 20. I'm not sure exactly. But they would have received the benefit of the reimbursement under that agreement, and that would not have been available to them under common law. But you're saying if they had... It didn't transpire. Right, but the benefit... So they didn't receive a benefit. The potential of the benefit was there, and they used the Wellington Agreement in order to try and obtain that benefit for purposes of the reimbursement, at least. But the 1989 Agreement had a reimbursement clause. It had, you know, with interest. It did, but it was... So wasn't that what they were really relying on? Isn't that the only thing that gave them the right to even ask for reimbursement was the 1989 Agreement? Because they're not a party to Wellington. They're not a party to Wellington. I agree with you, Your Honor. But the provisions in the 1989 Agreement with respect to reimbursement are slightly more narrow than the Wellington Agreement. And as you look at their letter and you note that they cite back to the Wellington Agreement and not just the 1989 Agreement, they're trying to obtain the benefit, the full benefit, of what the Wellington Agreement has with respect to the reimbursement provisions. But not only under the DuPont case, Your Honor, is Flinko taking the position that Aviva is bound to the Wellington ADR and the subsequent arbitration, but, you know, what they're trying to do is have this court declare that it was essentially a false start, that by entering into the Wellington ADR with Flinko and by common counsel, who's very well versed in insurance litigation, all of the companies who are involved on the London market side are very longstanding insurance companies, they knew what they were doing. There was no advising at any time that their participation was temporary, that they reserved their right to withdraw from the Wellington ADR, that they reserved the right to litigate. I'm trying to... Did Flinko say at any time while this mediation process was going on that we'll participate only if you agree to the Wellington ADR provision? Did Flinko say that? Yeah. No, Flinko took steps to try and avoid piecemeal attempts at trying to resolve the coverage issues between itself and these insurance carriers, filed as pursuant to the Wellington Agreement they could with the CPR a request for Wellington ADR. Mr. Alvarez, on behalf of Aviva, at that point I believe it was Norwich or Commercial Union, agreed and represented Commercial Union, now Aviva, in that Wellington ADR. They never said to us, and when they came back and said that they were going to participate, then at that point in time, that was the fork in the road. They could have then said to Flinko, well, maybe we'll mediate with you, but don't forget, under the 1989 agreement, we think we have the right to litigate it. Why would they need to remind your client that when you guys were signatories of that? And it was a very clear reservation of litigation and a clear disclaimant of ADR under the Wellington. The only thing that they signed was the mediation agreement. So your client knew what the result was going to be, litigation, no? No, because there was no... at the time that it entered into the Wellington ADR, that it was going to rely on that provision. They could have and probably should have said, well, wait a minute, we're not going to participate in a Wellington ADR because we don't believe we are obligated to go through that seamless process and ultimately end in arbitration. They were the ones that should have said that, and by not saying it, it allowed Flinko to understand,  that that was what the process was going to be. Again, had they said at the beginning, hold on, we're going to rely on this litigation provision, that might have changed the whole scenario. And we're now in front... we were in front of two district courts on the arbitration issue. We're now in front of the Third Circuit. This could have been resolved a long time ago had Aviva wanted to rely on the litigation provision in the 1989 agreement. But in compelling arbitration, we think Judge Stark was correct. He found that there was an agreement to arbitrate under Wellington. It's very clear. And there was no dispute that the parties... there was no dispute amongst the parties that the insurance coverage issues that are going to be arbitrated, Aviva hopes litigated,  But the Teamsters case says that courses of conduct can demonstrate an assent to an arbitration provision in a contract. Did you make that argument to the district court? Yes. Yes, we did. But we're not relying on just the July 2006 letter where Mr. Alvarez said that they might need to enter into an agreement to stay the bankruptcy or get a carve-out from the bankruptcy. And not just the July 2012 letter on reimbursement, but the six years of conduct. And they're saying that, well, Flintcoat should have known. Flintcoat should have understood. Flintcoat should have, or could have at any point in time, gone to arbitration. But the mediation worked under the Wellington ADR because, as Mr. Alvarez said, Flintcoat did resolve its issues with some of his clients. And there would have been no reason to piecemeal arbitrations against certain of the carriers because that would go against the design of what Flintcoat was trying to do in the first place. So then their participation in the mediation didn't cause your client to change its position to its detriment because you guys continued and benefited from the mediation, albeit with other parties. It caused detriment because we're here now, and it's eight years later, litigating over the fact whether we should litigate or whether we should arbitrate. But you haven't at any point, as I've understood the record, translated that into any cognizable form of loss. I mean, you have merely characterized it as delay, a six-year period. Isn't that right? No, I think that the detriment... Has there been any effort to monetize it at all in the record? I don't know. We have not made any attempt to monetize it. But the detriment doesn't have to be material. We don't need to show materiality. The detriment could simply be the loss of the present value of the funds that we believe we're entitled to under the insurance policy. Well, it could be, but at no point has it been articulated that way in the course of the litigation. Well, I'm not sure that it needs to be quantified because I think I can say to Your Honor with a straight face, had we known back in 2006 that litigation was going to be the ultimate play by Aviva, that we could have started the litigation. It probably would have been done, and I'm an optimist, and I think that we would have recovered some of that money, and that money would have been in the coffers of Flinkhood in order to pay the asbestos claimants who now have claims against the bankruptcy. But you didn't even want to commence arbitrations in a piecemeal fashion, so why would you want to commence a full-blown litigation? Because when we were involved in the Wellington ADR, we understood, and nothing was ever said to the contrary by Aviva or, well, none of the other clients of Mr. Alvarez could because they were Wellington signatories. They never said to us that, you know, Flinkhood, we're not in this full bore. We're going to come out of this at the end, and we're going to try and litigate. Had they done that, that would have changed the landscape of the Wellington ADR proceeding because Flinkhood might not have said, okay, well, let's mediate and see what we can do, and then we'll start litigation. Sometimes a litigation that starts is better in the context of a mediation because there's something there with meat in it and with, you know, a judge looking down saying, you need to do this, this, this. You've got time frames, and that sometimes helps a mediation process along. But in this instance, that wasn't done. Do you have a position with respect to the issue I asked Mr. Alvarez about, and that is the standard of proof here with respect to demonstrating equitable estoppel? I don't know that the standard is clear and convincing. I would think that it would be a preponderance of the evidence. I don't have a cite for you. I'm sorry. Intuitively, I thought preponderance, too, until I saw the Delaware case. So would you agree that if Delaware law is applicable, and I understand you want Delaware law to be applicable here. Do you not? Well, the Wellington Agreement provides, it has a choice of law provision. So whether it's arbitrated or whether it's litigated, and whether it's litigated in Delaware or California, it is to be decided under the laws of the United States. So it could be California if Aviva... You know, that wasn't exactly what I asked, but... It could be Delaware, yes. I got you. Yes, we think that the present posture of the case, that Delaware law should apply. Short answer with a very long preface. Assuming that Delaware law applies and assuming that Delaware law says that clear and convincing is the standard, would you agree that Judge Stark did not make any mention at all about standard of proof here? I agree with Your Honor that in Judge Stark's opinion... That would be a big problem if the standard is clear and convincing, wouldn't it? Not necessarily, because I think that what the judge found was that there were enough facts there to support equitable estoppel. He didn't address... Under some standard, but we don't know what. Fair point, fair point. But I think that even under clear and convincing, looking at what he decided, looking at the facts that were established, that there was enough there to get over a clear and convincing standard. And one of the things that is interesting about the FAA and this Court's decision, and I believe it was Guidotti, is if there is some issue as to whether or not that it is then to be given back to the district court in order to have a summary trial, in order to have some discovery done, perhaps, in order to have testimony and evaluate witnesses... But that assumes there's an issue of fact, right? That's correct. That's if there's an issue of fact that can't be determined based upon the papers. But again, I think that the clear and convincing standard would be met in any event. I wanted to talk a little bit about waiver. And I think I touched on it earlier when Aviva made the decision to go forward with the Wellington ADR. And they knew, and their counsel knew, what the Wellington ADR was all about, because it is a process that gets you to arbitration, not litigation. There was never any communication to Flintcote to suggest that Aviva was not fully engaged in that proceeding from the beginning to the very end. And in fact, when the arbitration agreements were being negotiated, still Flintcote was under the impression, as it was six years prior to that, that Aviva had waived the litigation provision, as we call it, in the 1989 agreement. Thank you. Thank you very much. Mr. Alvarez, rebuttal. Yes, Your Honor. Thank you. I'll start briefly with the waiver issue. The few cases, and the United Airlines case, at 933 F 2nd, 110 2nd Circuit, and the Teamsters case that Mr. Schifolo talked about, waiver in those cases was only applied because the party in those cases actually went through with an arbitration and therefore waived. If my client had signed the arbitration agreement, I would agree that there would have been a waiver. But on these facts, I think we're very far from waiver. To address a couple points Mr. Schifolo made, he said Wellington is a three-step seamless process. Wellington does have three steps. The first step is mediation. Their three steps are negotiation, mediation, arbitration. When Wellington is read, in particular Appendix C, which deals with the ADR, the three steps are mediation, arbitration, and then an appeal to a three-judge panel. I think participating in mediation with other parties that had to proceed to arbitration is far from waiver, and it's not a basis for collateral or for equitable estoppel. Mr. Schifolo said that in DuPont, the court looked at... Your Honor asked what joint benefit CU received. He said, well, the Wellington agreement is the foundation for the CU agreement. Well, that's DuPont. The joint venture agreement was the foundation for the oral agreement under which DuPont sued, and that wasn't a direct benefit at DuPont. It's not a direct benefit here. Mr. Schifolo also says that the benefits are things that CU would have received. I would submit to the court, would have received is not a direct benefit. It's something in the future. In the cases that apply equitable estoppel, I'll talk about benefits received and not would have received. One more point on the mediation. The actual mediation agreement, which Flintcote says in their brief evidences a waiver of the CU agreement, the mediation agreement itself says nothing about waiving the CU agreement or the litigation provision in the CU agreement. I think it's interesting that when Judge Stark asked Mr. Schifolo at the argument at the district court whether Flintcote waived the CU agreement's litigation provision, Mr. Schifolo would not admit that Flintcote waived it. That goes to Your Honor's question about whether Flintcote even asked, are you going to proceed to arbitration? Are you going to agree that both sides would waive? And I think it's fair to say that both sides kept their powder dry on that issue. Lastly, Mr. Schifolo says, and I know I'm out of time, but just one more point. Mr. Schifolo says if Flintcote believed that that was the process that would lead to arbitration, I would submit there's nothing in the record to support that assertion. There's nothing in the record from Flintcote that supports that. Thank you, Your Honor. Thank you, Mr. Alvarez, Mr. Schifolo. We appreciate your very helpful arguments. We will take the case under advisement. Thank you.